United States District Court
Southern District of Texas
**ENTERED**
August 12, 2016
David J. Bradley, Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| JAMES LEE HICKEY, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. H-15-748 |
| | § | |
| CAROLYN W. COLVIN, | § | |
| ACTING COMMISSIONER OF THE | § | |
| SOCIAL SECURITY ADMINISTRATION, | § | |
| | § | |
| Defendant. | § | |

<u>**MEMORANDUM AND RECOMMENDATION**</u>

Pending before the court[1] are Plaintiff's Motion for Summary Judgment (Doc. 11) and Defendant's Cross Motion for Summary Judgment (Doc. 12). The court has considered the motions, the administrative record, and the applicable law. For reasons set forth below, the court **RECOMMENDS** that Plaintiff's motion be **DENIED** and Defendant's motion be **GRANTED**.

## I. Case Background

Plaintiff filed this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3) for judicial review of an unfavorable decision by the Commissioner of the Social Security Administration ("Commissioner" or "Defendant") regarding Plaintiff's claim for disability insurance benefits under Title II and supplemental security income ("SSI") under Title XVI of the Social Security Act ("The Act").

---

[1] This case was referred to the undersigned magistrate judge pursuant to 28 U.S.C. § 636(b)(1)(A) and (B), the Cost and Delay Reduction Plan under the Civil Justice Reform Act, and Federal Rule of Civil Procedure 72. <u>See</u> Doc. 10.

**A. <u>Medical History</u>**

Plaintiff's past medical history includes sleep apnea, diabetes, polycystic kidney disease and renal failure, hypertension, high cholesterol, obesity, neuropathy, and coronary artery disease status post-stenting.[2]

**1. Kidney Disease**

Plaintiff was diagnosed with polycystic kidney disease and end-stage renal failure and, in October of 2002, Plaintiff received a cadaveric kidney transplant.[3]

On June 16, 2007, Plaintiff visited Matthew Johns, M.D., ("Dr. Johns") at Baylor University Medical Center complaining of abdominal pain.[4] Dr. Johns noted that the pain was attributable to polycystic kidney disease, and Plaintiff's renal transplant was stable and non-suspicious.[5] Return visits to the Baylor University Medical Center on May 26, 2009, February 25, 2010, and July 1, 2010, noted that Plaintiff's creatinine levels were stable.[6]

On December 27, 2012, Plaintiff checked into the Baylor Scott and White Hospital in Brenham, Texas, complaining of abdominal pain

---

[2]    <u>See</u> Doc. 6, Tr. of the Admin. Proceedings ("Tr.") 654.

[3]    <u>See</u> Tr. 287, 338.

[4]    <u>See</u> Tr. 567.

[5]    <u>See</u> <u>id.</u>

[6]    <u>See</u> Tr. 615-16.

near the site of his 2002 surgery.[7]   Dale Glass, M.D., ("Dr. Glass") found that Plaintiff's kidney was enlarged and showed cysts consistent with polycystic kidney disease.[8]

### 2. Neuropathy

In January 2004, Plaintiff developed stinging pain in his toes and was diagnosed with peripheral neuropathy.[9]  Plaintiff's neurologist noted that the neuropathy may have been a side effect of Plaintiff's use of immunosuppressants.[10]  On September 29, 2004, Plaintiff reported memory problems after Neurontin dosage was increased from six hundred to eighteen hundred milligrams.[11]

On December 20, 2004, Plaintiff visited Sharon Nations, M.D., ("Dr. Nations") at the University of Texas Southwestern Neurology Clinic ("UT Southwestern") and complained of reflex sensory loss.[12]

On May 12, 2006, Plaintiff visited Jaya Trivedi, M.D. ("Dr. Trivedi") UT Southwestern.[13]  Plaintiff reported pain in his feet, although it had improved with treatment.[14]  Plaintiff stated that

---

[7]     See Tr. 824-25.

[8]     See Tr. 834.

[9]     See Tr. 503.

[10]    See id.

[11]    See Tr. 344, 503.

[12]    See id.

[13]    See Tr. 349.

[14]    See id.

his memory was "not as good as it used to be."[15]

On June 27, 2006, Plaintiff had a follow-up with Dr. Nations regarding his memory issues.[16]  Plaintiff was prescribed Keppra to treat neuropathy his Neurontin dosage was decreased.[17] Additionally, on July 1, 2010, Plaintiff reported that, "he sometimes gets dizzy."[18]

On January 13, 2011, Plaintiff visited Dr. Leal, M.D., ("Dr. Leal") at the Brenham Clinic.[19]  Dr. Leal noted that Plaintiff is "probably disabled and should consider going to the Texas Employment Commission or Social Security."[20]  Furthermore, Dr. Leal noted that Plaintiff "will have difficulty working any type of job because he must shift positions so often."[21]

On April 12, 2011, Plaintiff visited Dr. Tan, M.D., ("Dr. Tan").[22]  Dr. Tan noted that Plaintiff was experiencing "worsening numbness of the upper extremities," due to neuropathy, but noted no tremors and a positive Romberg's Test.[23]  Dr. Tan increased

---

[15]     See id.

[16]     See Tr. 623.

[17]     See id.

[18]     See id.

[19]     See Tr. 631.

[20]     See id.

[21]     See id.

[22]     See Tr. 634.

[23]     See id.

Plaintiff's prescription dosages.[24]

### 3. Heart

On June 24, 2011, Plaintiff sought treatment at the emergency room in response to acute onset of severe chest pain.[25] Plaintiff subsequently underwent a cardiac catheterization with coronary stent placement due to acute myocardial infarction.[26] On October 3, 2011, Plaintiff visited Navasota Medical Center for a rehabilitation examination.[27] During the examination, Plaintiff complained of fatigue, weakness, sleep disorder, shortness of breath, stiffness, numbness, tingling, and weakness.[28] As of October 3, 2011, Plaintiff was experiencing bilateral leg swelling due to implantation of the stent.[29] As of 2011, there were no other reported issues relating to Plaintiff's heart condition.[30]

### 4. Diabetes

On May 31, 2005, Plaintiff was referred to the Parklane Endocrinology Center in Dallas, Texas, by Dr. Nesser to rule out diabetes in connection with Dr. Nesser's treatment of Plaintiff's

---

[24]   See id.

[25]   See Tr. 645.

[26]   See Tr. 651.

[27]   See Tr. 711.

[28]   See Tr. 712. Plaintiff also complained of anorexia, but there are no other records indicating that Plaintiff suffered from anorexia.

[29]   See Tr. 711.

[30]   See id.

peripheral neuropathy.[31]  Plaintiff stated that he did not have headaches but did experience occasional blurriness of vision.[32]

On June 10, 2010, visited the Dallas Nephrology Associates for evaluation of his kidney transplant.[33]  Plaintiff reported high blood sugar and sweating, and insulin therapy was discussed.[34] At a follow-up appointment one week later, Plaintiff was prescribed insulin.[35]

On October 3, 2010, Plaintiff's insulin was reduced because his blood glucose was averaging 110 milligrams per deciliter, which was within a recommended range for persons with diabetes.[36]

On June 29, 2011, Plaintiff was discharged after his hospitalization following treatment for myocardial infarction.[37] At the time of his release, Plaintiff's diabetes was stable on five units of Levemir.[38]  Plaintiff was instructed to check his blood glucose on a daily basis and to be compliant with the five units of Levemir.[39]

---

[31]    See Tr. 344.

[32]    See id.

[33]    See Tr. 615.

[34]    See id.

[35]    See id.

[36]    See Tr. 711.

[37]    See Tr. 685.

[38]    See id.

[39]    See id.

### 5.  Sleep Apnea

On October 3, 2001, Plaintiff was admitted to Baylor Medical Center in Richardson, Texas, in order to undergo nasal surgery for obstructive sleep apnea.[40]  The medical records reflected that Plaintiff healed well after surgery.[41]

In February 2004, Plaintiff complained of nocturnal incontinence dating from May 2003, which he attributed to his non-use of his Continuous Positive Airway Pressure ("CPAP") machine, and not peripheral neuropathy because the bladder symptoms predated the neuropathy.[42]  It was recommended that Plaintiff consult with his neurologist.[43]  At the time of this appointment, Plaintiff listed his medications as Neoral, Cellcept, prednisone, Bactrim, Diovan, clonidine, Prevacid, Androgel, Flonase, Diflucan and Neurontin but did not complain of any side effects from these medications.[44]

On September 1, 2005, Plaintiff underwent a second nasal septal reconstruction to address a septal perforation.[45]  It was noted that Plaintiff did not complain of nausea, vomiting or

---

[40]    See Tr. 313.

[41]    See Tr. 314, 317.

[42]    See Tr. 319, 320.

[43]    See Tr. 320.

[44]    See id.

[45]    See Tr. 335.

7

diarrhea on that visit.[46]

## 6. Medications

Plaintiff took Rapamune since his kidney transplant in 2002. On May 31, 2005, Plainitff's Rapamune dosage was two milligrams per day.[47] The record does not indicate that Plaintiff reported specific Rapamune side effects to a doctor.

Plaintiff took Cellcept after his kidney transplant in 2002. The record reflects that Plaintiff's Cellcept dosage remained constant at five-hundred milligrams per day.[48] The record does not indicate that Plaintiff reported specific Cellcept side effects to a doctor.

Plaintiff was prescribed prednisone. The record reflects that Plaintiff's dosage was maintained at five milligrams a day, beginning on October 21, 2008.[49] The record does not indicate that Plaintiff reported specific prednisone side effects to a doctor.

Plaintiff was prescribed Neurontin for neuropathy. On April 1, 2004, Plaintiff's Neurontin dosage was six hundred milligrams per day.[50] On May 24, 2004, Plaintiff's Neurontin dosage was

---

[46]    See Tr. 338.

[47]    See Tr. 344.

[48]    See Tr. 344, 481, 493, 613, 633.

[49]    See Tr. 418.

[50]    See Tr. 503.

8

increased to eighteen-hundred milligrams per day.[51]  While on the increased Neurontin dosage, Plaintiff complained of "some problems with his memory."[52]  On May 31, 2005, Plaintiff's Neurontin dosage was once again at six-hundred milligrams per day.[53]  The record reflects no specific complaints regarding Neurontin at the 600 milligram dosage level.

Plaintiff was prescribed Lasix.  On March 3, 2009, the record indicates, Plaintiff's Lasix dosage was forty milligrams daily.[54] On April 12, 2011, Plaintiff's Lasix dosage was at eighty milligrams daily.[55]  The record does not indicate that Plaintiff reported specific Lasix side effects to a doctor.

Plaintiff was prescribed Singulair.  The record reflects that Plaintiff's Singulair dose was at ten milligrams since July 10, 2006.[56]  The record does not indicate that Plaintiff reported specific Singulair side effects to a doctor.

Plaintiff was prescribed Androgel for low testosterone.  The record reflects that Plaintiff's Androgel dosage was ten milligrams daily since May 31, 2005.[57]  The record does not indicate that

---

[51]   See id.

[52]   See id.

[53]   See Tr. 344.

[54]   See Tr. 493.

[55]   See Tr. 633.

[56]   See Tr. 360, 481, 633.

[57]   See Tr. 344, 481, 633.

Plaintiff reported specific Androgel side effects to a doctor.

Plaintiff was, at various times, prescribed other medications: Plavix, Carvedilol, Diovan, Lipitor, Zeita, Nexium, Carbamazepin, Nortriptyline HCL, Diflucan, Levemir Flexpen, and Novolog Flexpen.[58] The record does not indicate that Plaintiff reported any specific side effects from these medications to a doctor.

## B. Application to Social Security Administration

Plaintiff applied for disability insurance benefits and supplemental security income benefits on May 12, 2011.[59] Plaintiff indicated that he became unable to work due to his disability as of January 1, 2006.[60] Plaintiff claimed an inability to work due to neuropathy, polycystic kidney disease, irritable bowel syndrome, cytomegalovirus, complications from taking multiple medications, diabetes, sleep apnea, and acid reflux.[61]

Greatly expanding on his claim of medication side effects, Plaintiff claimed an increased instance of infection, slow wound healing, muscle pain, joint pain, back pain, weakness, edema, mild nausea, diarrhea, vomiting, high cholesterol, and high triglycerides from Rapamune, increased instances of infections, gas, mild nausea, vomiting, slight hand tremors, trouble sleeping,

---

[58]     See Tr. 263.

[59]     See Tr. 162.

[60]     See id.

[61]     See Tr. 187.

blurred vision, some confusion, difficulty concentrating, tiredness, and weakness from Cellcept, increased instances of infections and slow wound healing, thinning skin, mild nausea, vomiting, trouble sleeping, increased sweating, weakness, and lower leg swelling from prednisone, drowsiness, blurred vision, weakness, muscle-coordination problems, apathy, some difficulty walking, mild hand tremors, memory problems, problems with focusing on tasks, increased instances of infections, and swelling of lower legs, feet, and hands from Neurontin, drowsiness, tiredness, weakness, apathy, muscle coordination problems, some difficulty walking, memory problems, problems with focusing on tasks and increased instances of infections.[62] Plaintiff also attributed mild nausea, drowsiness, tiredness, weakness, lack of coordination blurred vision, excessive sweating, vomiting, occasional diarrhea, trouble sleeping, memory problems, and edema to Nortriptyline, Lasix, lisinopril, pravastatin, Prevacid, diflucan, Singulair, Androgel, and Neoral.[63]

In connection with his application for social security benefits, Plaintiff visited Corinne Alvarez-Sanders, Ph.D., ("Dr. Alvarez-Sanders") for a psychological evaluation on December 7, 2011.[64] Plaintiff's chief complaint was disability due to mental

---

[62]   See Tr. 212.

[63]   See Tr. 213.

[64]   See Tr. 735.

impairment.[65]    Prior  to  his  visit  with  Dr.  Alvarez-Sanders,
Plaintiff  had  not  been  taking  any  medication  for  a  mental  health
condition.[66]

Dr.  Alvarez-Sanders  noted  that  Plaintiff  had  difficulty
completing  complex  tasks  and  could  only  complete  one  task  at  a
time.[67]   Additionally,  Plaintiff  was  unable  to  stand  or  walk  for
extended  periods  of  time  due  to  fatigue  and  diminished  stamina.[68]
According  to  Dr.  Alvarez-Sanders,  Plaintiff's  functional  mental
capacity  was  in  the  average  range.[69]    Additionally,  Plaintiff's
thought  process  showed  no  looseness  of  association.[70]   In regard to
remote  memory,  Plaintiff's  listening  was  average,  whereas  his
immediate  memory  was  below  average.[71]    Dr.  Alvarez-Sanders  also
noted  that  Plaintiff's  concentration,  judgment,  and  insight  were
all  average.[72]

In  the  prognosis,  Dr.  Alvarez-Sanders  stated,  "Plaintiff  noted
that  he  has  experienced  diminished  memory  during  the  past  few
years,  but  there  was  no  significant  evidence  of  a  cognitive

---

[65]    See id.

[66]    See Tr. 736.

[67]    See id.

[68]    See id.

[69]    See id.

[70]    See Tr. 737.

[71]    See id.

[72]    See id.

disorder due to his average performance on the Folstein Mini-Mental State Exam."[73]   In addition, Dr. Alvarez-Sanders stated, "The prognosis is fair that Plaintiff will be able to maintain stable full time employment."[74]

In November of 2011, Patty Rowley, Ph.D, ("Dr. Rowley") completed a Physical Residual Function Capacity ("RFC") Assessment.[75]   In the exertional limitations section, Dr. Rowley indicated that Plaintiff had the ability to occasionally lift and/or carry fifty pounds.[76]   Additionally, Plaintiff had the ability to frequently lift and/or carry twenty-five pounds.[77]

Dr. Rowley also indicated that Plaintiff had the ability to stand and/or walk (with normal breaks) for a total of about six hours in an eight-hour workday.[78]   Plaintiff had the ability to sit (with normal breaks) for a total of about six hours in an eight-hour workday.[79]   Dr. Rowley also indicated that Plaintiff had the ability to push and/or pull (including operation of hand and/or foot controls).[80]

---

[73]     See Tr. 738.

[74]     See id.

[75]     See Tr. 732.

[76]     See Tr. 726.

[77]     See id.

[78]     See id.

[79]     See id.

[80]     See id.

In the postural limitations section, Dr. Rowley indicated that
Plaintiff had the ability to frequently perform the following
actions:  climb ramps, climb stirs, stoop, kneel, crouch, and
crawl.[81]  Also, Plaintiff had the ability to occasionally do the
following actions: climb latters, climb ropes, climb scaffolds, and
balance.[82]

Dr. Rowley noted that Plaintiff's activities of daily living
("ADLS") showed good function, including ability to lift forty to
fifty pounds, toss a ball for the dog to catch, complete certain
housework, grocery shop, and use the computer daily.[83] Additionally,
Dr. Rowley noted that Plaintiff was partially credible.[84]

On January 9, 2012, Margaret Meyer, M.D., ("Dr. Meyer")
completed a Mental Residual Functional Capacity ("RFC")
Assessment.[85]

Dr. Meyer evaluated Plaintiff's mental activity within the
context of his capacity to sustain activity over a normal workday
and workweek.[86] Dr. Meyer noted, "Plaintiff is able to understand
remember and carry out detailed, but noncomplex instructions."[87] Dr.

---

[81]   See id.

[82]   See id.

[83]   See Tr. 732.

[84]   See id.

[85]   See Tr. 741.

[86]   See Tr. 739.

[87]   See Tr. 741.

14

Meyer reported that "Plaintiff has the ability to make important decisions, concentrate for extended periods, interact with others, and respond to changes."[88]  Dr. Meyer also noted that Plaintiff's "alleged limitations from symptoms are not wholly supported by the record."[89]

In her Mental RFC Assessment, Dr. Meyer concluded that Plaintiff was not significantly limited in the following categories: (1) "[t]he ability to remember locations and work-like procedures;" (2) "[t]he ability to understand and remember very short and simple instructions;" (3) "[t]he ability to carry out very short and simple instructions;" (4) "[t]he ability to sustain an ordinary routine without special supervision;" (5) "[t]he ability to make simple work-related decisions;" (6) "[t]he ability to ask simple questions or request assistance;" (7) "[t]he ability to be aware of normal hazards and take appropriate precautions;" (8) "[t]he ability to travel in unfamiliar places or use public transportation;" and (9) "[t]he ability to set realistic goals or make plans independently of others."[90]

Additionally, Dr. Meyer evaluated Plaintiff as moderately limited in the following categories: (1) "[t]he ability to understand and remember detailed instructions;" (2) "[t]he ability

---

[88]    See id.

[89]    See id.

[90]    See Tr. 739-40.

to maintain attention and concentration for extended periods;" (3) "[t]he ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances;" (4) "[t]he ability to work in coordination with or proximity to others without being distracted by them;" (5) "[t]he ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods;" (6) "[t]he ability to interact appropriately with the general public;" (7) "[t]he ability to accept instructions and respond appropriately to criticisms from supervisors;" (8) "[t]he ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes;" (9) "[t]he ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness;" and (10) "[t]he ability to set realistic goals or make plans independently of others."[91]

Defendant denied Plaintiff's application at the initial and reconsideration levels.[92] Plaintiff completed an updated disability report but did not list any medication side effects.[93] Plaintiff requested a hearing before an administrative law judge ("ALJ") of

---

[91]   See id.

[92]   See Tr. 80-83, 102-09.

[93]   See Tr. 237-38.

16

the Social Security Administration.[94]   The ALJ granted Plaintiff's
request and conducted a hearing on May 8, 2013.[95]

**C. <u>Hearing</u>**

Plaintiff, his mother, and a vocational expert ("VE")
testified at the hearing.[96]   Plaintiff was represented by an
attorney.[97]

Plaintiff testified that he was fifty-three years old and
lived with his mother.[98]   He received food stamps and medical
assistance through a drug program.[99]   Plaintiff's weight was in the
"upper 200's, maybe 280, 290."[100]   Plaintiff did not use any type of
assistive device, such as a cane, for walking.[101]

Plaintiff testified that he graduated high school and had
earned two bachelors' degrees.[102]   Prior to December 2005, Plaintiff
worked as a plant manager.[103]   His plant manager job consisted of

---

[94]   <u>See</u> Tr. 116-17.

[95]   <u>See</u> Tr. 44-79.

[96]   <u>See</u> Tr. 45.

[97]   <u>See</u> Tr. 45, 62.

[98]   <u>See</u> Tr. 48.

[99]   <u>See</u> Tr. 49.

[100]   <u>See</u> <u>id.</u>

[101]   <u>See</u> <u>id.</u>

[102]   <u>See</u> <u>id.</u>

[103]   <u>See</u> Tr. 50.

paperwork and required no physical installation of parts.[104]  He was laid off in December of 2004 and had not worked since.[105]

Plaintiff testified that, while employed, it took him a long time to complete work, it was difficult for him to multi-task, and it was "hard for him to deal with the stress of a job."[106]  In regard to medication side effects, he said, "sometimes I feel ill."[107]  He also said, "sometimes it's not so bad."[108]

Plaintiff continued by describing what it was like when he had a bad day.[109] On a bad day, he looked at the internet for "less than an hour" and then stopped because he became tired.[110]  After sitting for "an hour or two," he would have to get up and stretch.[111]  Additionally, on a bad day, Plaintiff said he could stand for "an hour or two."[112]  After he ate and did other things around the house, he took a nap.[113]  Plaintiff claimed that he had bad days

---

[104]    See Tr. 51.

[105]    See Tr. 50-52.

[106]    See Tr. 53.

[107]    See Tr. 56.

[108]    See id.

[109]    See Tr. 57.

[110]    See id.

[111]    See id.

[112]    See Tr. 58.

[113]    See id.

several times per month.[114]   Plaintiff also claimed that he
experienced nausea, but said, "in the last two years I've only
thrown up maybe three times."[115]

Next, Plaintiff explained his reasons for not being able to
work a full time job.[116] He said due to "sleep apnea or the drugs,"
it was hard for him to wake up in the morning.[117]  Additionally, he
became exhausted when driving in traffic.[118]  Plaintiff also said
that he had a hard time reading more than twenty pages of
"technical stuff, and ha[d] difficulty writing and typing."[119]
Plaintiff further said that he could not do physical work because
he did not have very good balance.[120]

Plaintiff stated that he thought the medication slowed down
his brain.[121]  He said he could not tolerate hot outdoor conditions
because of his medication.[122]

Juanita Smith Hickey ("Ms. Hickey"), Plaintiff's mother, was

---

[114]    See Tr. 59.

[115]    See Tr. 58.

[116]    See Tr. 59.

[117]    See id.

[118]    See Tr. 59-60.

[119]    See Tr. 60-61.

[120]    See Tr. 63.

[121]    See id.

[122]    See Tr. 64.

called as a witness.[123]   She said that Plaintiff had a difficult
time comprehending what she told him, he would often forget what
she told him, he had difficulty filling out paperwork, and he could
not complete various household chores.[124]

Ms. Hickey also said that, due to swollen feet, Plaintiff had
a hard time walking and balancing.[125]   In regard to Plaintiff's
decreased ability to do things, Ms. Hickey said, "it's probably
from the medication."[126]

The VE said that Plaintiff's job as a plant engineer was
categorized as light exertion and skilled.[127]   The ALJ asked whether
a hypothetical individual with Plaintiff's experience and limited
to light work with additional restrictions climbing ropes, ladders,
or scaffolds, and limited to simple, routine tasks and only
occasional contact with the public would be capable of finding jobs
in the regional or national economy.[128]   The VE stated that the
hypothetical individual could perform a significant number of job
titles that exist in the region.[129]   The job titles cited by the VE

---

[123]   See Tr. 68.

[124]   See Tr. 68-69.

[125]   See Tr. 70.

[126]   See Tr. 71.

[127]   See Tr. 75.

[128]   See id.

[129]   See id.

included housekeeper and equipment cleaner.[130]  Both of these jobs were classified as light exertion and unskilled.[131]  Additionally, the VE said the hypothetical individual could work as a hand packager, which was classified as light exertion and unskilled.[132]

The ALJ then asked whether the same hypothetical individual would be able to find jobs with additional limitations of concentration loss, difficulty meeting attendance standards, and difficulty performing work on a regular basis.[133]  The VE stated that such an individual could not perform the previously mentioned jobs.[134]  The VE further opined that a hypothetical individual capable of light work could still find jobs even if he was forced to take up to five unscheduled breaks per day.[135]

## D. **Commissioner's Decision**

On July 26, 2013, the ALJ issued an unfavorable decision.[136] The ALJ found that Plaintiff had not been under a disability within the meaning of the Social Security Act from January 1, 2006, through the date of her decision.[137]

---

[130]    See id.

[131]    See id.

[132]    See Tr. 75.

[133]    See Tr. 77.

[134]    See id.

[135]    See Tr. 78-79.

[136]    See Tr. 35.

[137]    See Tr. 23.

At step one, the ALJ found that Plaintiff "ha[d] not engaged in substantial gainful activity since January 1, 2006, the alleged onset date."[138]   At step two, the ALJ concluded that Plaintiff had multiple severe impairments: obesity, polycystic kidney status post kidney transplant, coronary artery disease status post stenting, and diabetes mellitus with peripheral neuropathy.[139]   The ALJ found that Plaintiff's sleep apnea, gastrointestinal problems, and personality disorder were not severe impairments, as there were no records of continuing treatment and the impairments did not impose more than a slight limitation on Plaintiff's ability to perform work activities.[140]

The ALJ considered Plaintiff's alleged medication side effects, consisting of lack of concentration, fatigue, and forgetfulness.[141]   The alleged medication side effects were considered credible.[142]   The ALJ concluded that the state agency psychological consultation determined that Plaintiff could understand, remember, and carry out detailed but not complex instructions.[143]   The ALJ gave moderate weight to the state agency

---

[138]   See Tr. 25.

[139]   See id.

[140]   See Tr. 26.

[141]   See Tr. 26-27.

[142]   See Tr. 27.

[143]   See id.

assessment.[144]

The ALJ went on to assess the four functional areas, known as "paragraph B" criteria.[145]  First, Plaintiff only had mild limitation in "activities of daily living," due to his ability to shop, drive, do household chores, use the internet, and generally care for himself.[146]  Second, Plaintiff's social functioning ability was only mildly limited, due to his ability to interact appropriately with the public and an absence of interpersonal relationship difficulties in his personal history.[147]

Third, the ALJ concluded that Plaintiff had mild limitation in the area of "concentration, persistence or pace."[148]  The ALJ reasoned that Plaintiff was able to follow instructions and complete tasks once begun, as evidenced by his activities of daily living.[149]  Furthermore, the ALJ noted that, based on a psychological evaluation, Plaintiff had average concentration.[150] The fourth area concerned was episodes of decompensation. The ALJ concluded that there were "no episodes of decompensation in work or

---

[144]    See id.

[145]    See id.

[146]    See id.

[147]    See id.

[148]    See id.

[149]    See id.

[150]    See id.

work like settings of extended duration."[151]

At step three, the ALJ concluded that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of a Listing (the "Listings").[152]   Plaintiff did not meet the Listing for his coronary artery disease because "medical records do not substantiate any narrowing of bypassed or non-bypassed arteries."[153]   The ALJ also noted that Plaintiff had previously been advised to walk twenty-to-thirty minutes per day.[154] Plaintiff did not meet a Listing for impairment of renal function.[155]   The ALJ noted that "the record does not document any episodes of rejection, reported side[]effects of immunosuppressant[s], or renal infections."[156]   The ALJ went on to conclude that Plaintiff's peripheral neuropathy and diabetes did not meet a Listing.[157]

At step four, the ALJ concluded that Plaintiff had the RFC to perform light work.[158]   Furthermore, Plaintiff was to have no more

---

[151]   See Tr. 28.

[152]   See id.  The Listings are found at 20 C.F.R. Pt. 404, Subpt. P, App. 1. 20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926.

[153]   See id.

[154]   See id.

[155]   See id.

[156]   See Tr. 29.

[157]   See id.

[158]   See id.

than occasional contact with the public and was limited to simple, routine work.[159]

The ALJ noted that Plaintiff's testimony was "not entirely credible regarding the severity of his symptoms and their effect on his ability to perform work-related activities."[160]   Furthermore, the documentation submitted by Plaintiff reflected a greater level of activity than did Plaintiff's testimony.[161]  Plaintiff's alleged symptoms were inconsistent with his level of activity.[162]  The ALJ noted that the inconsistencies reflected poorly on Plaintiff's overall credibility.[163]   Moreover, the ALJ concluded that Plaintiff's impairments had minimal effect on his ability to function, were not totally disabling, and did not preclude the performance of substantial gainful activity.[164]

In addition to the five-step sequential evaluation, the ALJ also discussed the testimony of Plaintiff's mother.[165]   The ALJ mentioned that Ms. Hickey testified that Plaintiff had "difficulty comprehending what he was asked to do and had difficulty completing

---

[159]     See id.

[160]     See Tr. 30.

[161]     See id.

[162]     See id.

[163]     See id.

[164]     See Tr. 33.

[165]     See Tr. 30.

paperwork."[166]   Additionally, she testified that Plaintiff "[was] weaker and [could not] help around the house other than fill the dishwasher."[167]  She also reported that he could not do yard work or repairs and had difficulty walking because of swelling in his feet.[168]  Ms. Hickey also added that Plaintiff took a nap every day.[169]  She thought his issues were due to side effects from his medications.[170]

The ALJ found that Plaintiff was unable to perform past relevant work, but that he maintained the RFC to perform a significant number of jobs in the regional and national economy.[171] Specifically, the ALJ found that Plaintiff would be able to work as a housekeeping cleaner, equipment cleaner, or packager.[172]

Finally, at step five, the ALJ concluded, "there are jobs that exist in significant numbers in the national economy that the claimant can perform."[173]  Based on the testimony of the vocational expert, Plaintiff was found able to perform the requirements of occupations such as a housekeeping cleaner, equipment cleaner, or

---

[166]    See id.

[167]    See id.

[168]    See id.

[169]    See id.

[170]    See id.

[171]    See Tr. 33-34.

[172]    See Tr. 34.

[173]    See Tr. 34.

hand packager.[174]

Plaintiff appealed the ALJ's decision, and, on January 16, 2015, the Appeals Council denied Plaintiff's request for review, thereby transforming the ALJ's decision into the final decision of the Commissioner.[175]  After receiving the Appeals Council's denial, Plaintiff timely sought judicial review of the decision by this court.[176]

## II. Standard of Review and Applicable Law

The court's review of a final decision by the Commissioner denying disability benefits is limited to the determination of whether: 1) the ALJ applied proper legal standards in evaluating the record; and 2) substantial evidence in the record supports the decision.  Waters v. Barnhart, 276 F.3d 716, 718 (5th Cir. 2002).

## A. Legal Standard

In order to obtain disability benefits, a claimant bears the ultimate burden of proving that he is disabled within the meaning of the Act.  Wren v. Sullivan, 952 F.2d 123, 125 (5th Cir. 1991). Under the applicable legal standard, a claimant is disabled if he is unable "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment. . . which has lasted or can be expected to last for a continuous period of

---

[174]   See id.

[175]   See Tr. 1-6.

[176]   See Doc. 1, Pl.'s Compl.

27

not less than twelve months." 42 U.S.C. § 423(d)(1)(a); <u>see also</u>
<u>Greenspan v. Shalala</u>, 38 F.3d 232, 236 (5th Cir. 1994). The
existence of such a disabling impairment must be demonstrated by
"medically acceptable clinical and laboratory diagnostic" findings.
42 U.S.C. § 423(d)(3), (d)(5)(A); <u>see also</u> <u>Jones v. Heckler</u>, 702
F.2d 616, 620 (5th Cir. 1983).

To determine whether a claimant is capable of performing any
"substantial gainful activity," the regulations provide that
disability claims should be evaluated according to the following
sequential five-step process:

> (1) a claimant who is working, engaging in a substantial
> gainful activity, will not be found to be disabled no
> matter what the medical findings are; (2) a claimant will
> not be found to be disabled unless he has a "severe
> impairment;" (3) a claimant whose impairment meets or is
> equivalent to [a Listing] will be considered disabled
> without the need to consider vocational factors; (4) a
> claimant who is capable of performing work that he has
> done in the past must be found "not disabled;" and (5) if
> the claimant is unable to perform his previous work as a
> result of his impairment, then factors such as his age,
> education, past work experience, and [RFC] must be
> considered to determine whether he can do other work.

<u>Bowling v. Shalala</u>, 36 F.3d 431, 435 (5th Cir. 1994); <u>see also</u> 20
C.F.R. §§ 404.1520, 416.920. The analysis stops at any point in
the process upon a finding that the claimant is disabled or not
disabled. <u>Greenspan</u>, 38 F.3d at 236.

## B. <u>Substantial Evidence</u>

The widely accepted definition of "substantial evidence" is
"that quantum of relevant evidence that a reasonable mind might

accept as adequate to support a conclusion." Carey v. Apfel, 230 F.3d 131, 135 (5th Cir. 2000).  It is "something more than a scintilla but less than a preponderance." Id.  The Commissioner has the responsibility of deciding any conflict in the evidence. Id.  If the findings of fact contained in the Commissioner's decision are supported by substantial record evidence, they are conclusive, and this court must affirm. 42 U.S.C. § 405(g); Selders v. Sullivan, 914, F.2d 614, 617 (5th Cir. 1990).

Only if no credible evidentiary choices of medical findings exist to support the Commissioner's decision should the court overturn it.  Johnson v. Bowen, 864 F.2d. 340, 343-44 (5th Cir. 1998).  In applying this standard, the court may not reweigh the evidence, decide the issues de novo, or substitute the court's judgment for the Commissioner's judgment. Brown v. Apfel, 192 F.3d 492, 496 (5th Cir. 1999).  In other words, the court is to defer to the decision of the Commissioner as much as possible without making its review meaningless.  Id.

### III. Analysis

Plaintiff requests judicial review of the ALJ's decision to deny disability benefits.  Plaintiff asserts that the ALJ's decision contains the following errors: (1) The ALJ erred in evaluating the side effects from Plaintiff's medications; (2) The ALJ erred in failing to ascribe any weight to the testimony by Ms. Hickey; and (3) The ALJ failed to consider all of the evidence.

Defendant responds that the ALJ's decision is legally sound and is supported by substantial evidence.

## A. Medication Side Effects

Plaintiff argues that the ALJ erred by failing to properly evaluate the side effects from Plaintiff's medication.

The regulations state that any side effects of medication should be assessed when reaching a decision on a claimant's ability to work. 20 C.F.R. §§ 404.1529 (c)(3)(iv), 416.929(c)(3)(iv); see also Loza v. Apfel, 291 F.3d 378, 396-97 (5th Cir. 2000). An ALJ's assessment of a plaintiff's RFC must consider the "limitations or restrictions imposed by the mechanics of treatment; e.g., frequency of treatment, duration, disruption to routine, side effects of medication." SSR 96-8p.

Plaintiff acknowledges that the ALJ in this case did expressly consider Plaintiff's medication side effects, finding that his statements regarding lack of concentration, fatigue, and forgetfulness were credible. Plaintiff argues that although the ALJ found these side effects were credible, she erred by not discussing Plaintiff's medications and additional side effects, instead finding that Plaintiff was still able to perform light work.

Here, the ALJ clearly considered Plaintiff's side effects regarding his reported memory loss, fatigue, and lack of concentration. The ALJ elsewhere in the record addressed

30

Plaintiff's complaints regarding gastrointestinal problems, fatigue, dizziness, trouble sleeping, and muscle weakness. The ALJ therefore addressed all relevant side effects supported by objective medical evidence. See <u>Cagle v. Colvin</u>, No. H-12-296, 2013 WL 2105473, *8 (S.D. Tex. May 14, 2013) (holding that failure to discuss side effects not supported in the record was harmless error).

Further, the ALJ incorporated Plaintiff's side effects into his RFC, limiting him to occasional contact with the public and simple, routine work. The ALJ specifically stated that Plaintiff was more limited than Dr. Alvarez-Sanders' RFC report based on Plaintiff's complaints regarding concentration, fatigue, and forgetfulness.

The ALJ did not err in evaluating the side effects of Plaintiff's medication. The record shows that the ALJ considered and noted medication side effects supported by the record and incorporated them into Plaintiff's RFC.

## B. **Ms. Hickey's Testimony**

Plaintiff argues that the ALJ failed to ascribe any weight to Ms. Hickey's testimony. Plaintiff argues that the ALJ's failure to find his mother's testimony wholly credible presents reversible error.

In <u>Gardner v. Massanari</u>, the plaintiff contended that the ALJ failed to accord proper weight to the testimony of the plaintiff's

mother.  Gardner v. Massanari, 264 F.3d 1140, 2001 WL 822457, at *1 (5th Cir. 2001) (unpublished).  The court stated, "even though it would have been preferable for the ALJ to comment directly on the testimony of the mother, any error in failing to do so was harmless."  Id. at *1.  The court found that the plaintiff's mother's testimony was essentially duplicative of the plaintiff's own testimony, and therefore did not affect the plaintiff's substantial rights.  Id.  In sum, "[p]rocedural perfection in administrative proceedings is not required.  [The] court will not vacate a judgment unless the substantial rights of a party have been affected."  Mays v. Bowen, 837 F.2d 1362, 1364 (5th Cir. 1988).

Here, Ms. Hickey testified that Plaintiff's issues include: weakness, problems comprehending, an inability to do certain types of house-work, and "a general decreased ability to do things."  Ms. Hickey opined that this was due to Plaintiff's medications.  Plaintiff's own testimony was substantially identical regarding his health issues.  Plaintiff is correct that the ALJ did not assign a specific weight to Ms. Hickey's testimony.  The ALJ did not credit Plaintiff's testimony to the extent that it was contradicted by Plaintiff's self-reported activities of daily living, which showed less restrictions than Plaintiff reported at the hearing.  Although the ALJ did not explain that he similarly credited Ms. Hickey's testimony except when it conflicted with Plaintiff's reports and objective medical evidence, such error was harmless.

## C. Failure to consider all the evidence

The Plaintiff's third complaint is that the ALJ failed to consider all the evidence. Plaintiff argues that the ALJ failed to "evaluate or even mention" records from Baylor Scott and White Hospital.

There is no need for the ALJ to discuss each and every piece of evidence in the record. Bordelon v. Shalala, 41 F.3d 661, 1994 WL 684574 *1 (5th Cir. 1994) (unpublished). An ALJ's failure to discuss every piece of medical evidence does not establish an actual failure to consider the evidence. Castillo v. Barnhart, 151 F. App'x 334, 2005 WL 2675002 *1 (5th Cir. 2005)(unpublished) (citing Falco v. Shalala, 27 F.3d 160, 163 (5th Cir. 1994)).

Plaintiff is correct that the ALJ did not specifically discuss Plaintiff's records from Baylor Scott and White Hospital. Although the ALJ did not cite these records, there is no indication that he did not consider them.

Further, even if Plaintiff had established that the ALJ did not consider this evidence, there is no evidence that these records could have affected the ALJ's decision. Although the ALJ did not specifically discuss Plaintiff's emergency room visit for abdominal pain caused by polycystic kidney disease, the ALJ evaluated Plaintiff's kidney disease and found that it did not meet or medically equal a Listing. Similarly, while the ALJ did not cite to the Baylor Scott and White Hospital records, she evaluated

33

Plaintiff's coronary bypass and found that it failed to meet or medically equal a Listing.  The ALJ considered each of Plaintiff's impairments and made an RFC finding based on substantial record evidence.

It is evident from the ALJ's decision that she thoroughly evaluated the evidence in the record in order to determine that Plaintiff had the ability to perform light, unskilled work.  The ALJ's written decision is supported by substantial evidence of record.

### IV. Conclusion

Based on the foregoing, the court **RECOMMENDS** that Plaintiff's motion be **DENIED** and Defendant's motion be **GRANTED.**

The Clerk shall send copies of this Memorandum and Recommendation to the respective parties who have fourteen days from the receipt thereof to file written objections thereto pursuant to Federal Rule of Civil Procedure 72(b) and General Order 2002-13.  Failure to file written objections within the time period mentioned shall bar an aggrieved party from attacking the factual findings and legal conclusions on appeal.

The original of any written objections shall be filed with the United States District Clerk electronically.  Copies of such objections shall be mailed to opposing parties and to the chambers of the undersigned, 515 Rusk, Suite 7019, Houston, Texas 77002.

**SIGNED** in Houston, Texas, this 12th day of August, 2016.

34

U.S. MAGISTRATE JUDGE